## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JULIE BEBERMAN,

       *Plaintiff*,

  v.

ANTONY BLINKEN *in his official capacity as Secretary of State*,

       *Defendant*.

Civil Action No. 21-3082 (TJK)

## <u>MEMORANDUM OPINION</u>

Shortly after Julie Beberman began adjudicating visa applications in Venezuela for the U.S. Foreign Service, her supervisor noticed that she had not complied with required procedures when approving several applications. The supervisor eventually discovered performance problems that caused him to revoke Beberman's access to the consular systems. Over a year later, Beberman successfully applied for a position as a political officer at the embassy in Malabo, Equatorial Guinea. The job description included back-up consular duties, meaning that Beberman would probably adjudicate visa applications from time to time while fulfilling her responsibilities as a political officer. But after realizing that Beberman's access to the consular systems had been revoked for deficient performance, members of the Foreign Service's Consular Affairs team refused to renew it. The embassy thus removed Beberman's consular duties, but she still served as a political officer in Malabo.

Beberman filed a grievance against the Department of State based on the elimination of those duties. She argued that she ended up in a new position once the back-up consular responsibilities were removed, so the agency's internal policies required that an assignment panel review and approve the new assignment. Beberman also contended that eliminating these duties was

retaliation for other grievances she had filed.  The Foreign Service Grievance Board rejected these arguments, leading Beberman to bring this suit that challenges the Board's decision as arbitrary, capricious, and contrary to law.  But the Board's interpretation of the policies governing the assignment process—specifically, that assignment panels play a role in the assignment of an employee to a position, not the adjustment of job responsibilities after that assignment—was correct. Thus, its denial of Beberman's appeal was not unlawful for that reason.  And the Board reasonably determined that the Department had a legitimate, non-pretextual reason for pointing out Beberman's prior revocation of consular access, refusing to renew that access, and removing her backup consular duties as a result.  Finally, Beberman's scattershot arguments challenging other orders by the Board are meritless.  So the Court will deny her motion for summary judgment and grant the Department's cross-motion.

## I.    Background

### A.    Legal Background

Within the Department of State ("the Department"), the U.S. Foreign Service "works through its Foreign Service Officers to advocate American foreign policy, protect American citizens, and promote American interests throughout the world." *Shea v. Kerry*, 796 F.3d 42, 46 (D.C. Cir. 2015) (internal quotation marks and citation omitted).  These officers perform a range of "traditional diplomatic responsibilities, including trade promotion, political and economic reporting, and consular services and protection." *Id.* (internal quotation marks and citation omitted).  They do so first "under a limited appointment as a career candidate for a trial period" of five years at most.  22 U.S.C. § 3946(a); 22 C.F.R. § 11.20(a)(3).  During the trial period, the Secretary of State decides whether to recommend a candidate for a career appointment and tenure in the Foreign Service.  § 3946(a)(2).  That tenure decision turns on "the candidate's demonstrated potential . . . to serve effectively as a Foreign Service Officer."  3 Foreign Affairs Manual ("the Manual" or

"FAM") 2245.1. Those not recommended for tenure are "separated from the Service," usually when their limited appointment expires. *Id.*

To "govern" its "operations" and those of the Foreign Service, the Department has promulgated the Foreign Affairs Manual and Foreign Affairs Handbook ("the Handbook" or "FAH"), which together constitute a "single, comprehensive, and authoritative source for the Department's organization structures, policies, and procedures." *See* U.S. Dep't of State, *Foreign Affairs Manual: Public*, https://perma.cc/RP8P-S6VZ (last visited Dec. 10, 2024). Several provisions address how Foreign Service employees receive "assignments"—that is, "tour[s] of duty of six months or longer to a Foreign Service . . . position." 3 FAH-1 H-2421. Sometimes employees receive "directed assignments" to certain positions. The Foreign Service's Director General may assign employees in this way "at any time . . . on the basis of Service need." 3 FAH-1 H-2422. Typically, however, a Foreign Service officer candidate's "initial two assignments" are "identif[ied]" by career development officers, while "subsequent assignments" normally happen through participation "in the open assignments bidding process." 3 FAM 2242.1; *see also* 3 FAH-1 H-2425.8-6(b).

This open-assignment system "is primarily intended to fulfill Service need." 3 FAH-1 H-2425.1(b). Participating employees begin the process by submitting bids reflecting their preferences to an electronic system. 3 FAH-1 H-2425.2-2(a). This bidding system is critical; "[a] position may be assigned only after it has been advertised for at least two weeks in the . . . system." 3 FAH-1 H-2425.4(e). After the system collects bids, "[a]ssignment panels . . . review and approve assignments of employees to all [Foreign Service] positions." 3 FAH-1 H-2425.3-1(a). If either the employee or the relevant bureau is unhappy with a panel decision, they may appeal it to the Director General. 3 FAH-1 H-2425.3-2(a)–(b). Employees who fail to receive an assignment through the open-assignment system "may be directed to an assignment by the" Director General.

3 FAH-1 H-2425.6(b).

### B.    Factual Background

Beberman began working for the Department in early 2010. ECF No. 37-4 at 2. Almost two years later, she arrived in Caracas, Venezuela to serve as a vice consular officer. *Id.* An "essential function of the consular position" is "[b]eing able to identify individuals designated as ineligible to enter the United States" when assessing visa applications. ECF No. 37-1 at 85. For that reason, "[w]henever a consular officer issues a visa for admission," the officer must "certify that a check of the automated visa lookout system"—*i.e.*, a system containing information about the excludability of applicants—"has been made, and that there is no basis under such system or list for the exclusion of such applicant." 9 FAM 307.3-1(b)(1); *see also* Pub. L. 103-236, § 140(b), (c). The failure to follow procedures required by the results of a lookout-system check must be "considered as a serious negative factor in . . . performance evaluation[s]." 9 FAM 307.3-1(b)(2).

Beberman's supervisors eventually noticed problems with her issuance of visas. In a November 2012 performance evaluation, the Caracas visa chief explained that Beberman had "an extremely low refusal rate" for visas that was "less than one-third that of the officer with the next-lowest refusal rate." ECF No. 37-2 at 7. He also discovered that Beberman had issued a visa that July despite the applicant being "a direct match" to a "hit" in a lookout system listing individuals who are temporarily barred from receiving visas. *Id.* At a counseling session, Beberman insisted "that she was correct in issuing the visa." *Id.* After further review, the visa chief "discovered 15 nonimmigrant visa cases" in which Beberman issued visas to "applicant[s] who had been refused" at least once before "without making any notation . . . that she was aware of the prior refusal(s)." *Id.* Concerns about those decisions, coupled with additional "potential Visa Lookout Accountability (VLA) violations," led the visa chief to remove Beberman's access to the consular systems—access that is essential to adjudicating visas. *Id.* The reviewing officer described this performance

4

evaluation as "a sober, accurate account of what took place" and "supported" the decision to "invalidate[] [Beberman's] consular systems login." *Id.* at 9. Soon after, Beberman cut short her Caracas assignment before starting work as "the deputy multilateral affairs and African Union desk officer" in Washington, D.C. ECF No. 37-4 at 2.

In 2013, Beberman bid on and was offered a position as a "Political Officer" at the embassy in Malabo, Equatorial Guinea. ECF No. 37-4 at 9, 12. The description of this role listed a host of duties that the incumbent performed and that, presumably, the replacement would too. For example, the incumbent had to manage "the combined political and economic section," the "Ambassador's Self-Help program," and the "Democracy and Human Rights Fund." *Id.* at 9. He also supervised two assistants, researched and prepared reports on human rights and religious freedom, drafted "spot reports and analytical cables," and worked as the "control officer for most visitors." *Id.* "In addition to" all these political duties, "the incumbent serve[d] as back-up to the lone consular/public diplomacy officer." *Id.* Beberman accepted the offer in November 2013, *see id.* at 14, but the embassy did not expect her to arrive in Malabo until around December 2014, *see id.* at 39.

Apart from this assignment, Beberman was also dealing with the tenure process and the ramifications of her performance problems. In June 2013, the Department proposed a two-day suspension for four specific times when Beberman issued visas without complying with required procedures. ECF No. 37-1 at 83–86. The Department eventually reduced that proposed suspension to one day, but it maintained that "the charge and specifications of 'Violation of Visa Lookout Accountability . . . Requirements' is supported by the evidence." *Id.* at 149. In August 2014, Beberman received the disappointing news that the Commissioning and Tenure Board had not recommended her for tenure. ECF No. 37-15 at 200. That board had concerns about several

aspects of Beberman's performance, including the deficiencies from her time in Caracas that demonstrated "extremely poor judgment" and a lack of receptiveness to feedback. *Id.*

Beberman filed several grievances as a result, *see, e.g.*, ECF No. 37-1 at 160, which led the Department to designate Marcia Bernicat—a deputy assistant secretary for human resources— as its representative to negotiate a global settlement. Mediation began in October 2014 and quickly produced a potential resolution. *See id.* at 277. Indeed, Beberman seemed to seriously consider the offer—so much so that, while negotiations were ongoing, she emailed embassy leadership in Malabo on October 27 to tell them about the "possibility of [her] not coming to Malabo" for the position she had accepted. ECF No. 37-3 at 25. She explained that Bernicat had proposed a solution that would return Beberman to her work as an engineering officer and allow her to "reach [her] goal of becoming eligible to retire in 2017." *Id.* That "bombshell," as Beberman termed her email, created significant concern at the embassy. ECF No. 37-1 at 277. The ambassador imme- diately emailed Bernicat to explain that the embassy expected Beberman to cover a short-term gap in consular officers and to request information about whether Beberman would serve in Malabo. *See* ECF No. 37-3 at 24. Bernicat responded that she could not provide that information; the parties were engaged in mediation, so those communications had to remain confidential. *See id.* at 23–24. The ambassador understood this constraint but asked Bernicat to provide an update as soon as possible given the "immediate, operational impact" that would result from a "change in [Beberman's] mid-December arrival." *Id.* at 23.

Just over a month later, on December 8, Beberman apparently told Bernicat that she would not accept the then-current settlement offer unless the Department reduced the disciplinary action to an admonishment. ECF No. 37-21 at 8. Robert Jackson, a principal deputy in the African Affairs bureau, emailed a Consular Affairs deputy three days later to "confirm that [Beberman]

has visa and passport adjudicating authority." ECF No. 37-3 at 28. He sent that email because he had learned that "her adjudicating authority was revoked in Caracas." *Id.* Beberman insists that Bernicat told Jackson on December 11 about the revocation of her consular-systems access. *See* ECF No. 20-1 at 34. Although the record is not clear on the precise date, Jackson recalled that Bernicat told him about the suspension of "Beberman's adjudication authority" to "inform [Jackson] of the need to contact [Consular Affairs] about" her ability to perform consular duties in Malabo. ECF No. 37-4 at 68.

Whether Beberman could access the consular systems and adjudicate visas was an urgent issue given her impending arrival in Malabo, so Jackson followed up with Consular Affairs on December 15. That same day, Consular Affairs told him that Beberman would "not receive authorization to adjudicate visas and passports in light of her serious performance issues in Caracas." ECF No. 37-3 at 27. When Beberman reported to Malabo a week later, the embassy informed her that she would not perform back-up consular duties. ECF No. 37-1 at 4.

That decision sparked a long battle before agency adjudicators. Beberman filed a grievance in July 2015, alleging that removing her back-up consular duties violated an applicable law, regulation, or published agency policy, and that the action was retaliatory. *See* ECF No. 37-1 at 14. More specifically, she said that the decision violated the rules governing the open-assignment system because an assignment panel had to review the change to her job duties. *Id.* at 14–15. And the decision was allegedly retaliatory because Bernicat told Consular Affairs of "her concerns" only after "mediation did not pan out." *Id.* at 17.

On behalf of the Department, a deputy assistant secretary denied Beberman's grievance three months later. She explained that Beberman "failed to identify a specific provision" of the Department's assignment policy that was violated. ECF No. 37-1 at 9–10. The removal of certain

duties, moreover, happened because Beberman was "unable to meet a critical prerequisite for performing backup consular duties" without consular access, which she had lost because of performance deficiencies. *Id.* at 10. As for the retaliation claim, the deputy noted that Beberman had no evidence that Bernicat was involved in the ultimate decision to not renew her access. *Id.* And again, that decision stemmed from Beberman's "performance issues in Caracas," not from any retaliatory animus. *Id.* at 11. So the deputy concluded that Beberman had not carried her burden of establishing retaliation by a preponderance of the evidence. *Id.* at 11–12; *see also* 22 C.F.R. § 905.1(a).

Beberman appealed this denial to the Foreign Service Grievance Board ("the Board") in January 2016. ECF No. 37-1 at 4. Between then and the Board's denial of her appeal in June 2021, Beberman also filed a flurry of other motions requesting various forms of relief. Because the parties focus mainly on the Board's 2021 denial, only an overview of these other motions is necessary.

To start, Beberman moved in March 2016 for interim relief from separation from the Foreign Service. *See* ECF No. 37-18 at 10. The Board denied that request in September 2019 because Beberman failed to show that she was reasonably likely to prevail on the merits. *See id.* at 5, 24. Beberman sought reconsideration a few weeks later, and the Board denied that motion too, while granting the Department's motion to strike mediation correspondence that Beberman had included in her briefing. *See* ECF No. 37-37 at 6. Doubling and tripling down, Beberman moved unsuccessfully—twice—for reconsideration of the order striking the correspondence. *Id.* at 6–7. Also in 2019, the Board denied Beberman's motion to compel the Department to, among other things, answer several interrogatories and produce certain documents. *See* ECF No. 37-13 at 5, 10. The Board reasoned that many of the requests were irrelevant to Beberman's grievance, *see id.* at 12,

16, 19–20, 22–23, 25, 27, 29, 31, and it denied her motion for partial reconsideration, *see* ECF No. 37-17 at 5. Finally, in September 2020, the Board denied Beberman's motion for recusal of the entire Board. *See* ECF No. 37-28 at 5.

Now to the decision at the heart of this lawsuit: the Board's order affirming the denial of Beberman's grievance challenging the elimination of her back-up consular duties. Starting with the improper-assignment claim, the Board rejected Beberman's argument that the decision to prevent her from performing back-up consular duties was a reassignment, so she was not entitled to assignment-panel review and approval for that change. ECF No. 37-32 at 24, 26, 28. Instead, the elimination of those duties meant only that some aspects of Beberman's work requirements had changed as a necessary result of the decision by Consular Affairs to not renew her access to consular systems. *See id.* at 28. The Board also noted that Beberman had "remained silent on her removal from consular duties and systems at her previous post" when communicating with Malabo leadership, even though "the regional consular liaison officer . . . specifically asked her to describe her previous consular experience." *Id.* at 26.

As for the retaliation claim, the Board rejected it for several independent reasons. First, the Board concluded that Beberman had not established a materially adverse action. ECF No. 37-32 at 29. The removal of back-up consular duties was not a significant change in job responsibilities, and Beberman's claim that she lost the chance to prove herself deserving of tenure was far too speculative. *See id.* at 29–30. Second, the Board determined that Beberman did not show a causal connection "between the challenged agency conduct and her protected activities." *Id.* at 33. Mere temporal proximity was insufficient, and Beberman's other causation arguments did not persuade the Board. Third and finally, the Board found that Beberman had not shown that the

Department's independent, non-retaliatory reasons for its actions were pretextual. *See id.* at 44. So it denied her appeal as to both claims.[1]

## II.    Legal Standard

Although both parties move for summary judgment, the ordinary summary-judgment standard does not apply. Congress directed that § 706 of the Administrative Procedure Act "shall apply" to "judicial review of a final action of the Secretary or the Board on any grievance." 22 U.S.C. § 4140(a).[2] And when reviewing "agency action under the APA," the Court "sits as an appellate tribunal." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001). That is, the Court has no factfinding role because the case presents "a question of law." *See id.* So the Court must ask "whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Citizens for Resp. & Ethics in Wash. v. SEC*, 916 F. Supp. 2d 141, 145 (D.D.C. 2013).

On top of its purely procedural requirements, the APA directs courts to "hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious . . . or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The question under arbitrary-and-capricious review "is not what [the Court] would have done, nor whether [the Court] agree[s] with the agency action." *Ams. for*

---

[1] After the Board's denial, Beberman moved to reopen the record for further discovery and for leave to file a motion for reconsideration. The Board denied both requests and put a stop to her filings, ordering that "[n]o future motions to reconsider this Order, however such motions are styled or captioned, will be accepted for filing." ECF No. 37-37 at 15.

[2] Section 4140(b)(2) provides for de novo review of certain grievances "based on an alleged violation of a law, rule, regulation, or policy directive referred to in section 4131(a)(1)(H)." Beberman has not argued that her grievance falls within this carveout, and the enumerated "discrimination" statutes listed in § 4131(a)(1)(H) do not seem applicable. In any event, § 4140(b)(2) imposes a deadline that Beberman missed: judicial review under that provision is available only if the "aggrieved party . . . commences a civil suit[] not later than 90 days after such party receives notice of the final action of the Secretary or the Board."

*Clean Energy v. EPA*, 864 F.3d 691, 726 (D.C. Cir. 2017) (citation omitted).  Instead, the touch-stone is "whether the agency action was reasonable and reasonably explained." *Id.* (citation omitted).  "Under that deferential standard, an agency action will be set aside as arbitrary and capricious if the agency has failed to follow procedures required by law, failed to examine the relevant data and articulate an adequate explanation for its action including a rational connection between the facts found and the choice made, or failed to consider an important aspect of the issue." *Henry v. Sec'y of Treasury*, 266 F. Supp. 3d 80, 87 (D.D.C. 2017).  And although courts "may not supply a reasoned basis for the agency's action that the agency itself has not given," they "must uphold a decision of less than ideal clarity if the agency's path may be reasonably discerned." *Banner Health v. Price*, 867 F.3d 1323, 1356 (D.C. Cir. 2017) (internal quotation marks and citation omitted).

## III.     Analysis

Beberman challenges both aspects of the Board's denial of her grievance appeal.  She starts by arguing that the Board arbitrarily and capriciously rejected her argument that the Department needed an assignment panel's sign-off before removing her back-up consular duties.  Next, she says that the Board erred in rejecting her retaliation claim.  In her briefing, she adds several challenges to other Board rulings, including evidentiary ones.  But none of her arguments, individually or collectively, show that the Board's decision was arbitrary, capricious, or otherwise contrary to law.  The Board's interpretation of the Department's policies was sound, as was its conclusion that the Department offered legitimate, non-pretextual reasons for eliminating Beberman's back-up consular duties.  And her other contentions are waived, meritless, or both.

### A.     The Board's Conclusion That the Department Did Not Violate Its Own Policies by Removing Some of Beberman's Job Duties Was Not Arbitrary, Capricious, or Otherwise Contrary to Law

Beberman contends that the Department's regulations required an assignment panel to

review and approve the removal of her back-up consular duties. So she reasons that the Department violated its own regulations by not convening a panel and that, as a result, the Board acted arbitrarily and capriciously by concluding otherwise. The Department responds that the Board's rejection of this claim is "consistent with the plain language of the regulations at issue." ECF No. 22 at 25. And even if the "plain language" does not carry the day, the Department says that the Board's interpretation deserves deference under *Kisor v. Wilkie*, 588 U.S. 558 (2019). *See id.* at 26.

Both parties have confused matters by referring to the relevant provisions as "regulations." They are not. These policies within the Manual and Handbook are just that—"policies and procedures that govern the operations of the State Department [and] Foreign Service." *Foreign Affairs Manual: Public*. In other words, the "FAM and the State Department's [FAH]" are "informal documents" that "are distinct from 'rules or regulations.'" *Sabra ex rel. Baby M v. Pompeo*, 453 F. Supp. 3d 291, 320 (D.D.C. 2020) (quoting *Miller v. Clinton*, 687 F.3d 1332, 1341 (D.C. Cir. 2012)). That distinction creates two potential wrinkles. First, do the relevant "internal policies" on Foreign Service assignments "govern[] the rights of individuals" and "bind[]" the Department such that agency non-compliance with those policies "may be arbitrary and capricious"? *Aracely, R. v. Nielson*, 319 F. Supp. 3d 110, 150 (D.D.C. 2018); *see also Zakon v. Blinken*, No. 22-cv-1524 (CJN), 2022 WL 4474053, at *2 (D.D.C. Sept. 26, 2022). And second, does the deference owed to "agencies' reasonable readings of genuinely ambiguous *regulations*" apply to the Board's interpretation of the *policies* described in the Manual and Handbook? *Kisor*, 588 U.S. at 563 (emphasis added). Although clarifying the nature of the relevant policies here is important, the Court need not answer either question. Even assuming that a violation of the assignment policies would be actionable, and that the Board's interpretation is not entitled to deference, Beberman has not

shown that the policies required the Department to convene an assignment panel before removing her back-up consular duties.

The Board interpreted the relevant Manual and Handbook provisions to mean that the elimination of Beberman's consular duties from her political officer position did not create a new "position" or "assignment" requiring review and approval by an assignment panel. Beberman argues that this interpretation contradicted the Department's policies, which she claims *mandated* assignment-panel review of this change in job responsibilities, and that the Board's decision was thus arbitrary, capricious, or contrary to law. It was none of those things. Because the "[t]ext, structure, and . . . context" of the assignment policies "show that" post-assignment adjustments to job responsibilities—at least in Beberman's case—do not require assignment-panel review, the Department did not violate its internal policies. *Huashan Zhang v. USCIS*, 978 F.3d 1314, 1322 (D.C. Cir. 2020). And the Board did not act arbitrarily and capriciously in reaching that conclusion.

Start with how the policies distinguish between the assignment of employees and the assignment of job duties—and how only the former contemplates the involvement of assignment panels. The Handbook delineates a clear role for those panels: they "review and approve assignments *of employees* to [Foreign Service] positions." 3 FAH-1 H-2425.3-1(a) (emphasis added). That is what happened when Beberman—an employee—received an assignment to the political officer job—a Foreign Service position—in Malabo. The policies say nothing, though, about any role for assignment panels in reviewing adjustments to job responsibilities *after* a panel assigns an employee to a position.

That silence is especially telling because other policies discuss the assignment of job duties and responsibilities without suggesting that assignment panels are involved. The Manual, for example, defines "Position" as the "specified set of all duties and responsibilities currently assigned

or delegated by competent authority." 3 FAM 2614. And there is no suggestion that *this* assign-ment—*i.e.*, of job duties to a position—involves an assignment panel. The definition of "Position Description" as "*management's* assignment of duties, responsibilities, and supervisory relation-ships to a position" points in the same direction. *Id.* (emphasis added). Together, these definitions contemplate that "management" and "competent authority" handle assignments *of duties* to a po-sition, while the Handbook provides that assignment panels come into play only for "assignments *of employees*" to a position. 3 FAH-1 H-2425.3-1(a) (emphasis added).

This distinction shows that when the drafters of these policies wished to specify a role in the assignment of duties to a position, they "kn[e]w[] how to say just that." *Trump v. Hawaii*, 585 U.S. 667, 692 (2018). They could have used that language for assignment panels by saying, for example, that the panels must review and approve "assignments of employees to Foreign Service positions and the *assignment of duties* to any such positions." Yet the relevant policies "use [that] term in [some] provision[s] but not" in the provisions setting out the panels' role. *Newman v. FERC*, 27 F.4th 690, 698 (D.C. Cir. 2022). So the Court "presume[s] that the drafter[s] acted 'intentionally and purposely in the disparate inclusion or exclusion.'" *Id.* (quoting *United States v. Villanueva-Sotelo*, 515 F.3d 1234, 1248 (D.C. Cir. 2008)). In short, the policies "separately address[]" the assignment of employees and the assignment of duties. *Huashan Zhang*, 978 F.3d at 1320. And by "including" a role for assignment panels in the former but not the latter, the policies "implicitly exclude[] other" functions for assignment panels beyond the assignment of an employee to a position. *Id.* Or, at the very least, the policies show that the panels are not *required* to play a part in the assignment of job duties.

The Board's interpretation is also "consistent with the . . . purposes" of the assignment system. *Peabody Midwest Mining, LLC v. Sec'y of Lab., Mine Safety & Health Admin.*, 70 F.4th

602, 608 (D.C. Cir. 2023).  That purpose is clear: ensure that the Foreign Service can fulfill its mission by managing its employees effectively.  Congress, for instance, provided that "management official[s]" in the Department have "the authority" to "assign work . . . and to determine the personnel by which the operations of the Department shall be conducted."  22 U.S.C. § 4105(a)(4).  The Manual and Handbook drive this general point home in the specific context of Foreign Service assignments.  Indeed, "[t]he overriding consideration in the assignment of Foreign Service personnel . . . is the needs of the Service as defined by the Director General"—needs that account for "the most effective use of the employee's experience and competencies."  3 FAM 2424.3(a).  That focus tracks the assignment system's "primar[y]" function, which is "to fill Service need."  3 FAH-1 H-2425.1(b).  The policies also "underscore[] the need for coordination between operating managers, personnel staffs, [and] management operations staffs . . . in position management implementation," 3 FAM 2612(a), as well as the general rule that agencies must "manage positions efficiently," 3 FAM 2612(c).  And such "management is greatly dependent on the skill and judgment of managers and supervisors," including the use of "their inherent position management responsibilities" and a "continuing process of evaluation wherein the work structures and staffing patterns are systematically assessed for improvement . . . and for the most productive employment of individuals."  3 FAM 2617.  In brief, the policies direct the Department to be proactive in managing employees and their positions efficiently.[3]

Beberman's reading clashes with that directive and the purpose of the policies.  Consider

---

[3] Beberman asserts that "there is nothing in the regulations that gives the Department the authority to make changes to a Foreign Service Officer's assignment when the change is to a 'limited job responsibility.'"  ECF No. 32 at 14.  As explained, Beberman's "assignment" was to the political officer position in Malabo, which did not change after her back-up consular duties were eliminated.  In any event, the Manual and Handbook provisions discussed above—not to mention the statutory authority to manage the workforce and work assignments, *see* 22 U.S.C. § 4105— undercut Beberman's claim that the Department lacks leeway to adjust job responsibilities.

just some of the consequences of her view that an adjustment to job responsibilities requires as-signment-panel review and approval. Malabo's deputy chief told Beberman in May 2014 that the embassy had "decided that [it would] assign the Post Security Officer duties elsewhere to ensure [that Beberman was] not overburdened . . . and to share the 'wealth.'" ECF No. 37-1 at 50. Under Beberman's theory, the embassy could not have implemented that decision unless an assignment panel had convened, reviewed, and approved the change. Not only that, but because Beberman's reading would classify the position as a new position after the removal of security duties, the "as-signment" to that position could have happened "only after [the position] ha[d] been advertised for at least two weeks in the electronic bidding system." 3 FAH-1 H-2425.4(e). So the embassy's attempt to fairly and efficiently allocate work by adjusting one aspect of an employee's job duties would require it to post the "new" position to the electronic system, wait at least two weeks, and then continue to wait for an assignment panel to approve (or reject) the removal of those duties. To reiterate, the Court finds that the plain language of the policies forecloses Beberman's inter-pretation. But the unworkable consequences of her reading—especially given the stated purpose of the policies governing assignments and Foreign Service positions—confirm that the Board's interpretation is sound.

Beberman's arguments to the contrary are unpersuasive. She leans heavily on the follow-ing syllogism: (1) an "assignment" is to a "position"; (2) a "position" means "all duties and re-sponsibilities currently assigned or delegated"; (3) a "position description" identifies the "duties and responsibilities for each position"; (4) thus, any change to the duties listed in that description creates a new position and assignment, requiring review and approval by an assignment panel. *See, e.g.*, ECF No. 20-1 at 6–7; ECF No. 32 at 5. But that reasoning falters because it assumes that a change to one of a position's several duties—even back-up duties—transforms the position

into a new one.  Nothing in the policies, however, requires or even hints at that extreme and impractical result.  As the Department explains, "that a larger thing consists of many elements does not mean that the elimination or replacement of any single component renders the larger thing something completely"—or even meaningfully—"different."  ECF No. 22 at 27.  And the policies addressing job responsibilities confirm that the Department can change an employee's duties without creating a new position.  Recall that "position" means "the specified set of all duties and responsibilities currently assigned or delegated."  3 FAM 2614.  The focus on a position's *current* duties and responsibilities—not, for example, the duties and responsibilities "listed in the position description"—signals that a change in duties does not transform the position into something new for purposes of the assignment system.  Further, before establishing a "new position," management coordinators must "explore[]" the "possibility of incorporating the duties of the proposed position into existing positions."  3 FAM 2617(2)(c).  So rather than show that an alteration of job responsibilities creates a new position, the Manual *encourages* the adjustment of duties to *avoid* creating new positions that would trigger the assignment-panel process.

Beberman also insists that panel review was necessary because the key decision about her consular access was made in Washington, D.C., rather than Malabo.  In her view, the location of that decision shows that her change in job duties created a new position and was not "just a typical change" to work responsibilities for operational reasons.  *E.g.*, ECF No. 26 at 12–13.  But this is a distinction without a difference for purposes of her claim that an assignment panel needed to approve the elimination of certain duties.  Beberman never explains why the location of the decision to adjust job responsibilities—or even the reason for that decision—makes a difference for whether the change results in a new position requiring assignment-panel involvement.  Nor does she connect this idea to any of the policies that she claims were violated.  Her theory is that a change to

the duties listed in the position description means that the Department has created a new position and must start over with an assignment panel. That theory is wrong, but it also contradicts this argument that the location of the decision—or the rationale behind it—bears on whether panel review is necessary.

Beberman's other arguments fall flat too. She says that her diplomatic title of Vice Consul means that she was "assigned abroad to perform consular functions," so the back-up consular duties were a necessary part of the political officer position. ECF No. 20-1 at 8. But it does not follow that every employee with a consular title *must* perform consular duties simply because only employees with a consular title *may* perform consular duties. Nor does Beberman explain why her expectation that she would perform such duties entitles her to additional review by an assignment panel. After all, any employee might expect to perform all the duties (and only the duties) listed in a position description. But as explained, the removal (or addition) of a particular job duty does not transform an existing position into a new one under the Department's policies, regardless of the employee's hopes and expectations. Beberman's observation that she should have received an "assignment notification" for the change in her duties suffers from a similar logical gap. Receiving such a notification for a one-year extension to her tour does not somehow mean that the removal of back-up consular duties was a new "assignment" requiring panel review. ECF No. 26 at 19–20.

Nor does Beberman move the needle by relying on Standard Operating Procedure A-06. That "[a]uxiliary and supplemental material," *see* 3 FAH-1 H-2421, says that "assignment panels must approve all extensions, curtailments, and reassignments at post or within Department offices," ECF No. 37-29 at 68. But again, Beberman cites this provision without explaining why the removal of one aspect of her job duties was a "reassignment." And the operating procedure's

discussion of reassignments cuts against the idea that such an adjustment qualifies. Instead, the operating procedure contemplates that reassignment will be to a "new position," *id.* at 76, not to the same position after an employee is told that she will not perform certain back-up duties.[4]

In sum, the Board did not err in its interpretation of the Department's policies on assignments. And that interpretation forecloses Beberman's claim that the Board's decision was arbitrary, capricious, or contrary to law.

## B.    The Board's Conclusion that Beberman Failed to Establish Retaliation Was Reasonable

Foreign Service members may file grievances based on "action[s] alleged to be in the nature of reprisal" for participating in grievance procedures. 22 U.S.C. § 4131(a)(1)(F); *see also id.* § 4133(a). As the Board explained, a grievant bringing such a claim must show that "(1) she engaged in protected activity, including filing grievances, (2) the agency subjected her to a materially adverse personnel action; (3) the agency official or officials who took the adverse action had actual, or constructive, knowledge of her protected activity; and (4) there was a causal connection between grievant's protected activity and the adverse action." ECF No. 37-32 at 28; *see also, e.g.*, *Beberman v. Blinken*, No. 23-cv-686 (TJK), 2024 WL 4332070, at *4 (D.D.C. Sept. 27, 2024); *In the Matter Between [Redacted] Grievant and Department of State*, FSGB No. 2014-026, at 15–16 (June 1, 2016). An action is materially adverse if it "might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination'" or engaging in other protected activity.

---

[4] Beberman offers two other arguments that rest on faulty premises for reasons already explained. First, she says that the "unilateral[] change[]" of her assignment rendered the Malabo position a "directed assignment," which she claims is improper because she had already served two directed assignments. ECF No. 26 at 20. For that theory to work, however, Beberman must have been assigned to a new position when the embassy removed her back-up consular duties. She was not. Second, Beberman claims that the burden should have "shift[ed] to the Department to prove that the procedural error . . . was harmless." *Id.* But Beberman has established no error at all.

*Johnson v. Mao*, 174 F. Supp. 3d 500, 512 (D.D.C. 2016) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67–68 (2006)).  If a defendant asserts a "legitimate non-retaliatory explanation" for the action, the focus of the inquiry becomes "the ultimate issue of retaliation *vel non*." *Jones v. Bernanke*, 557 F.3d 670, 678 (D.C. Cir. 2009).  And to overcome such an explanation, the plaintiff "must show '*both* that the reason was false[] *and* that [retaliation] was the real reason" for the adverse action—that is, that the given explanation was pretext for retaliation.[5]  *Weber v. Battista*, 494 F.3d 179, 186 (D.C. Cir. 2007) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)); *see also, e.g.*, *Stephenson v. Buttigieg*, 712 F. Supp. 3d 33, 41 (D.D.C. 2024).

Beberman argues that the Department retaliated against her by removing her back-up consular duties after she rejected a settlement offer during grievance negotiations in December 2014. As she sees things, Bernicat retaliated by flagging the potential problem with consular-systems access, which caused Consular Affairs to not renew her access and, ultimately, the embassy in Malabo to eliminate her back-up duties.  And although she often loses sight of the APA standard of review, she argues (at least indirectly) that several deficiencies in the Board's rejection of her retaliation claim show that the decision was arbitrary, capricious, or otherwise contrary to law. But the Court need not decide whether the Board erred by concluding that Beberman did not suffer a materially adverse action or failed to show causation.  *See* ECF No. 20-1 at 23, 31.  Because the Board reasonably concluded that Beberman did not establish that the Department's legitimate,

---

[5] Proof that the defendant's explanation "for its decision was false" might "be quite persuasive" "circumstantial evidence" that the real reason for the employment decision was discrimination or retaliation.  *Lathram v. Snow*, 336 F.3d 1085, 1088 (D.C. Cir. 2003) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000)).  But even if evidence of falsity is strong, the ultimate inquiry remains the same: has the plaintiff shown that "the real motivation . . . was to retaliate against the employee"?  *Williams v. Verizon Wash., D.C. Inc.*, 304 F. Supp. 3d 183, 190 (D.D.C. 2018).

non-retaliatory explanation was pretextual, the Board's decision rejecting the retaliation claim passes muster.

The Department offered legitimate reasons for each link in the chain that led to the removal of Beberman's back-up consular duties. It explained that Bernicat flagged the prior revocation of Beberman's consular-systems access because she was responding to a potentially urgent staffing issue that Malabo had identified. ECF No. 37-32 at 40–41. For its part, Consular Affairs declined to restore Beberman's access because it determined that doing so would jeopardize national security given the performance problems underlying her initial loss of access. *Id.* at 41. The Board accepted these explanations and found that Beberman failed to establish pretext. *Id.* Specifically, the Board noted that *Beberman* created the concern within the embassy by mentioning that she might not show up for her assignment—a concern that Bernicat tried to address while also respecting the confidentiality of mediation. *Id.* at 43. Beberman needed something more than mere temporal proximity, the Board explained, and none of her evidence or arguments showed that the Department's explanation was a pretext for retaliation.

That decision was reasonable and reasonably explained, and Beberman's contrary arguments are unavailing. She contends mainly that the timeline shows pretext. In her view, Bernicat sounded the alarm on the prior revocation of Beberman's access shortly after Beberman rejected a settlement offer, showing that Bernicat did so to retaliate for Beberman's grievance activity. All the more so, Beberman says, because Bernicat learned about the potential staffing problem on October 27 but did not point out the revoked access until sometime between December 8 and December 11.[6] So any genuine concerns about Beberman's ability to perform back-up consular

---

[6] Beberman identified no record evidence establishing exactly when Bernicat contacted Jackson. But the Board did not say, explicitly or implicitly, that Bernicat's communication

duties would have come up before Bernicat told Jackson.

The Board grappled with this argument and "articulate[d] a satisfactory explanation for" rejecting it. *Sault Ste. Marie Tribe of Chippewa Indians v. Haaland*, 659 F. Supp. 3d 33, 50 (D.D.C. 2023) (citation omitted). To start, the Board correctly explained that Beberman needed more than suspicious timing. After all, "when an employer comes forward with a legitimate, non-retaliatory reason for an employment action"—as the Department did here—"positive evidence beyond mere proximity is required" to show that retaliation motivated the action. *Minter v. District of Columbia*, 809 F.3d 66, 416–17 (D.C. Cir. 2015) (internal quotation marks and citation omitted); *see also, e.g.*, *Jeffries v. Barr*, 965 F.3d 843, 861 (D.C. Cir. 2020). So even assuming that Bernicat raised the prior revocation in the days following Beberman's rejection of the settlement offer, that timing alone is not enough. This "temporal proximity argument," moreover, "is further under-mined by the undisputed fact that the [Department]" had already determined that her performance problems warranted revocation of her consular-systems access and, necessarily, her ability to per-form consular duties. *Cf. Bonnette v. Shinseki*, 907 F. Supp. 2d 54, 74 (D.D.C. 2012) (explaining that an employee's timing argument was undermined because the agency "was considering termi-nating her before she filed her 2009 EEO complaint"); *Congress v. Gruenberg*, 643 F. Supp. 3d 203, 236 (D.D.C. 2022) (similar). In other words, the concerns about Beberman did not emerge out of thin air. Other supervisors had already decided that she had shown serious errors in judg-ment incompatible with consular responsibilities, further undercutting Beberman's theory about the timeline.

---

happened before the rejection of the settlement offer. *See* ECF No. 37-32 at 34. And its decision acknowledged Beberman's claim that Bernicat waited until after that moment to "act on" the prior revocation of access. *See id.* at 38. So the Court assumes that Beberman is right about the timing because, as explained, the Board's decision tracks that timing and is reasonable even if Bernicat contacted Jackson when Beberman says she did.

But what about Beberman's claim that Bernicat's *delay*—rather than mere temporal proximity—establishes pretext?  Although the Board could have addressed this argument more clearly, the Court "can reasonably discern the [Board]'s path in its decision."  *Press Cmmc'ns LLC v. FCC*, 875 F.3d 1117, 1122 (D.C. Cir. 2017).  Recall that Beberman told the embassy on October 27 that she might not report to her assignment given the settlement offer on the table.  Had Beberman accepted that offer, there would have been no reason to address the revocation of her consular access; she would not have served as a political officer in Malabo, so she would have never needed to perform back-up consular duties requiring access.  And as the Board explained, Bernicat "was reluctant on principle to convey information about [Beberman]'s status while mediation was underway."  ECF No. 37-32 at 43.  So Bernicat had two priorities: the confidentiality of mediation and the "urgent potential staffing issue brought to her attention by" Malabo leadership.  *Id.* at 41. She did not know whether she would need to address the prior revocation until Beberman rejected the settlement offer that, according to Beberman, would have kept Beberman from working in Malabo.  But Bernicat "was forced to address the issue" when Beberman signaled that she would assume her role as a political officer despite the settlement offer, so she pointed out the potential problem given the embassy's time-sensitive worries about staffing.  *Id.* at 43.  She could have hardly reasonably acted otherwise.

Further, the Board's "determination should be read in context."  *U.S. Sugar Corp. v. EPA*, 830 F.3d 579, 642 (D.C. Cir. 2016).  "Elsewhere in" its decision, *id.*, the Board explained that "[t]he record shows that [Beberman] could not have performed consular work without being able to use the consular database and information systems," ECF No. 37-32 at 11 n.19.  And she did not have that access; it needed to be "*renew[ed]*" given the prior revocation in Caracas, and Consular Affairs had "refused to" do that.  *Id.* at 11 (emphasis added).  So even if Bernicat did not flag

the revocation when she did, Beberman would have still had to obtain access to the consular systems to perform consular duties.  The potential staffing problems posed by Beberman's lack of access would have simply arisen later and put the embassy in an even trickier spot.  As Bernicat explained, "Embassy Malabo would have requested a log on to the consular computer systems for [Beberman] after her arrival at Post as a routine matter," and the Department "would have been required to make a decision about whether to restore [her] visa adjudication authority."[7]  ECF No. 37-3 at 12.  But "[b]y confirming" her ability "to adjudicate visas prior to her arrival" in Malabo, the "Africa Bureau" could "ensure" that the embassy "would be adequately staffed to provide visa adjudication services."  *Id.* at 12–13.  The Board accounted for this reality, which further supports its rejection of Beberman's pretext argument focused on the alleged delay.

"That another decisionmaker might have come to a different conclusion matters little." *Visinscaia v. Beers*, 4 F. Supp. 3d 126, 133 (D.D.C. 2013).  The Board's decision, read holistically, explains why Bernicat's delay—even assuming Beberman is right about the timeline—does not show that the Department's legitimate, non-retaliatory explanation was disingenuous.  Because the Court cannot "conclude that no rational adjudicator would have come to the same conclusion," it "must not disturb the agency's decision."  *Id.*

Beberman's other efforts to undermine the Department's explanation fare no better.  She

---

[7] Other parts of the record show that Beberman could not perform consular duties after the revocation in Caracas.  *See, e.g.*, ECF No. 37-16 at 20 (Caracas supervisor stating that he "disabled [Beberman's] login again.  She now has no access to any consular system"); ECF No. 37-6 at 12 (Department interrogatory response explaining that "[t]he actual granting of physical access to the consular systems is performed at post by the post consular officer," but that this officer "cannot grant physical access to the consular systems absent [Consular Affairs'] authorization").  Instead, at some point before she performed these duties, someone in the Department would have needed to give her access to the consular systems.  Beberman had hoped that this would happen without anyone realizing that her access had been revoked for performance deficiencies, but that hope does not undermine the Board's decision.

asserts that the decision to refuse her access to consular systems was rife with procedural irregu-larities and inconsistencies. For example, Beberman says that Consular Affairs decisionmakers said that it was "typical procedure" to deny renewed access, even though "they had never taken such a step before." ECF No. 32 at 22. She adds that there are no "notes" or "any record of their meeting" and that, more generally, it is "very unclear . . . who actually were the decision-makers." *Id.*

The problem is that none of these facts, even if true, show that the Department gave a false reason when it said that Beberman's prior revocation created significant concerns implicating its "overall national security responsibility." ECF No. 37-32 at 34. Put simply, "visa determinations" are "matters touching on national security." *Saavedra Bruno v. Albright*, 197 F.3d 1153, 1162 (D.C. Cir. 1999). And to the extent there are some inconsistencies or "gaps in recollection," *Mul-rain v. Donovan*, 900 F. Supp. 2d 62, 73 (D.D.C. 2012), they are "not in these circumstances the type of material inconsistency that demonstrates pretext," *Pollard v. Quest Diagnostics*, 610 F. Supp. 2d 1, 28 (D.D.C. 2009). Consider Beberman's claim that Consular Affairs decisionmakers Marjorie Ames and David Donahue falsely said that revoking access and refusing to renew it was "typical." ECF No. 32 at 22. Context shows why this alleged inconsistency is not the smoking gun that Beberman thinks it is. Ames explained that cases like Beberman's are "rare," that "spe-cific [c]ircumstances" matter, and that "it is typical not to provide this access if it has been removed for similar reasons." ECF No. 37-15 at 613. Donahue added that although "[e]ach case is differ-ent," the Department has "a statutory responsibility to ensure all laws and regulations are followed in the adjudication process[,] and previous performance can be an indicator when authorizing ac-cess." ECF No. 37-9 at 18. And "[t]ypically, an officer with adjudication performance deficien-cies like Ms. Beberman's would have his or her adjudication authorities revoked." *Id.* True, Ames

and Donahue could have used more precise language to clarify that they *personally* had not taken this action before, even though they believed that another employee with similarly severe performance problems would "typically" have his access revoked. But Beberman never explains why that perceived discrepancy is grounds for finding that the decisionmakers were not genuinely motivated by national-security concerns—or, more to the point here, why the Board acted arbitrarily and capriciously by declining to make Beberman's preferred inferential leap. So too for her claim that the decisionmakers did not take notes and showed some after-the-fact confusion about who was involved in the discussions about Beberman. Neither suggests that the asserted non-retaliatory reason was false.[8]

Beberman also launches a host of conclusory and irrelevant allegations that do not save her retaliation claim. She insists that the Board should have found that her "comparative evidence" showed pretext because "no other Foreign Service Officer" with lookout-system violations "had been barred from accessing consular systems at a subsequent post." ECF No. 26 at 36–37; *see also* ECF No. 32 at 18. This claim goes several bridges too far. That Ames and Donahue said they had not personally seen this happen before does not mean that *no* Foreign Service Officer has

---

[8] Along with this fundamental problem, Beberman's allegation that the record shows "mass confusion as to who made the decision" is overblown. ECF No. 20-1 at 40. She points to a deputy executive director's statement from September 2015—about nine months after the decision—that the "decision was made in conjunction with" Donahue, Ames, and two others. ECF No. 37-15 at 419–20. One of those others said that she "vaguely remember[ed] hearing that there was a problem" but that she was not involved with the "case." *Id.* at 608. For her part, Ames said in 2019 that five people participated in the "discussion" about Beberman and that "a decision was made." *Id.* at 67. Although these Department employees may not recall precisely who was involved in the discussions, the record does not show "mass confusion" about who made the ultimate decision. Several individuals could have "discussed" Beberman's case while only some made the final call. Nor do "mere gaps in recollection," *Mulrain*, 900 F. Supp. 2d at 73, or "minor variations in the descriptions" necessarily establish pretext, *Walker v. Johnson*, 798 F.3d 1085, 1094 (D.C. Cir. 2015). And to repeat, the key problem for Beberman is that she offers no reason that hindsight uncertainty about the number of decisionmakers shows that the Department's proffered reason is pretextual.

*ever* lost consular-systems access without getting it back.  But more importantly, Beberman fails to show that the record reveals differential treatment for "similarly situated" employees—that is, those with similar performance problems in similar circumstances.  *Baloch v. Kempthorne*, 550 F.3d 1191, 1200–01 (D.C. Cir. 2008); *see also Bonnette*, 907 F. Supp. 2d at 75 (no suggestion of pretext where plaintiff did "not indicate whether another employee" engaged in the same conduct). The Board also reasonably rejected Beberman's claim that Bernicat "felt 'ire' against her" because Beberman had criticized Bernicat's "legal reasoning."  ECF No. 37-32 at 39.  This sort of "conclusory allegation[]" is "insufficient to rebut the legitimate and non-retaliatory reason" for the Department's actions.  *Duncan v. Johnson*, 213 F. Supp. 3d 161, 199 (D.D.C. 2016).  That is especially true here because, as the Board noted, Beberman offered no evidence suggesting that Bernicat—who had "reviewed many . . . grievances and disciplinary proposals" "in her official capacity"—"took [Beberman's] criticisms so personally as to develop the claimed grudge."  ECF No. 37-32 at 39–40.  Finally, Beberman devotes much of her briefing to arguments that the Board's decision was unfair—that she should have been given another chance, that the lookout-system violations from Caracas were overblown, and that the Department waited until after she arrived in Malabo to tell her about the consular-access decision.  But none of that is relevant to the pretext question, which is not concerned with whether the "employer made the wrong decision."  *Duncan*, 213 F. Supp. 3d at 189.  Nor does it matter whether the "reason given . . . is not just, or fair, or sensible."  *Bonnette*, 907 F. Supp. 2d at 74 (citation omitted).  What Beberman needed to show is "that the explanation given is a phony reason."  *Id.* (citation omitted).  For all the reasons discussed, she did not.

### C.    Beberman's Other Challenges to the Board's Decisions Are Unavailing

Throughout her briefing, Beberman criticizes several Board decisions other than the denial of her grievance appeal.  But she does not develop arguments supporting most of these challenges.

27

Beberman admits, for example, that her arguments about the Board's denial of interim relief are "essentially the same" as those that she raised challenging the Board's decision on the merits. ECF No. 20-1 at 42. But by simply pointing to these arguments and asserting that the Board "made many of the same errors as discussed," *id.*, Beberman gave up the chance to argue that the denial of the interim-relief request should meet a different fate than the denial of her grievance. So that challenge fails for the reasons already explained.

Beberman says even less when referencing other Board decisions. She lists several Board rulings in her Amended Complaint as challenged orders, including her request that the entire Board recuse itself. *See* ECF No. 8-1 at 2. But she does not develop arguments supporting those challenges in her opening motion—or in any of her briefing—so the Court will not consider them.[9] Just as a litigant may not challenge district-court rulings merely by citing them in its notice of appeal, Beberman may not challenge Board orders by listing them in her complaint while "fail[ing] to make" a non-perfunctory "challenge in" her dispositive motion. *World Wide Minerals, Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154, 1160 (D.C. Cir. 2002); *see also Moore-Davis v. U.S. Dep't of the Navy*, 694 F. Supp. 3d 116, 127 (D.D.C. 2023). The Court will not gin up arguments about these orders for her.

Elsewhere, Beberman mentions two alleged errors in footnotes: the Board's denial of her request for (1) "discovery pertaining to the Department's policies and procedures regarding position descriptions," post-assignment changes to job duties, "and appeals of assignments," ECF No. 20-1 at 7 n.2, and (2) "all discovery concerning the Department's method for selecting employees

[9] Also within this category of orders are (1) the rejection of Beberman's motion for partial reconsideration of the denial of the motion to compel; (2) the denial of her motion for reconsideration of interim relief and her motion to strike; (3) the denial of her motion to reconsider the order denying her motion to strike; and (4) the denial of her motion for leave to file several reconsideration motions. *See* ECF No. 8-1 at 1–2.

to serve as its representative in mediating grievances," *id.* at 20 n.3.  But a footnote is not enough

to raise a claim before the Court either, especially because Beberman "discuss[ed]" neither issue

in her "[r]eply" or the surreply that the Court permitted her to file.  *Huntington v. U.S. Dep't of*

*Comm.*, 234 F. Supp. 3d 94, 101 (D.D.C. 2017) (not reviewing argument raised only "in a brief

footnote" and not discussed in reply); *see also, e.g.*, *White v. Four Seasons Hotel & Resorts¸* 244

F. Supp. 3d 1, 5 (D.D.C. 2017) ("[C]ourts need not consider cursory arguments made only in a

footnote." (internal quotation marks and citation omitted)).

      In any event, what Beberman does say in these footnotes is unavailing given the "extreme

deference" with which courts "review agency rulings on discovery."  *Port Auth. of N.Y. & N.J. v.*

*Dep't of Transp.*, 479 F.3d 21, 37 (D.C. Cir. 2007) (citation omitted).  Only "the most extraordi-

nary circumstances" will "warrant the Draconian sanction of overturning a reasoned agency deci-

sion" based on the agency's handling of the "conduct and extent of discovery in agency proceed-

ings."  *Hi-Tech Furnace Sys., Inc. v. FCC*, 224 F.3d 781, 789 (D.C. Cir. 2000) (quoting *Trailways*

*Lines v. ICC*, 766 F.2d 1537, 1546 (D.C. Cir. 1985)).  Here, the Board acted well within this broad

discretion when it denied Beberman's efforts to compel the Department to provide all policies and

procedures about position descriptions, changes to job responsibilities, and appeals from assign-

ments.  *See* ECF No. 37-13 at 11–14.  The Department's policies are publicly available in the

Manual and Handbook, and the Board reasoned that Beberman—having been unable to articulate

a colorable claim premised on a violation of Department procedures—could not in these circum-

stances "use the discovery process" as a "mere fishing expedition[]."  *Id.* at 13.  That is hardly a

novel proposition.  *See, e.g.*, *Diamond Servs. Mgmt. Co., LLC v. Knobbe, Martens, Olson & Bear,*

*LLP*, 339 F.R.D. 334, 340 (D.D.C. 2021) ("Discovery is not intended to be a fishing expedition,

but rather is meant to allow the parties to flesh out allegations for which they initially have at least

a modicum of objective support." (cleaned up) (citation omitted)). Beberman's speculation that there might be some unknown but relevant policy beyond the published ones is no basis for over-turning the Board's decision. Nor is her conclusory argument that the Board erred by rejecting her efforts to obtain discovery on the Department's selection rules for mediation representatives. The Board explained that such evidence would not be relevant to the improper-assignment claim or the retaliation claim, especially because general Department rules on mediation would not reveal whether Bernicat or anyone else acted with a retaliatory motive. ECF No. 37-13 at 25–26. Be-berman offers no reason to think that this ruling exceeded the Board's significant discretion.

Beberman's other evidentiary challenges falter against this deference too. She contends that the Board improperly excluded "evidence of what had transpired during mediation," which Beberman says would have "prove[d] the temporal proximity between her grievance activities and . . . Bernicat" flagging her prior revocation—specifically, that she rejected the settlement offer on December 8. ECF No. 20-1 at 33–35. Beberman adds that the Board should have permitted her to engage in further discovery about a report that was released on December 9 and that detailed her performance problems in Caracas. *See id.* at 37–38. But the Board reasonably rejected these evidentiary challenges. The mediation communications, the Board explained, were confidential. ECF No. 37-13 at 26–28. And the Board agreed with the Department's argument that the com-munications would add no new relevant information. *Id.* at 27. The Department had already con-ceded that Bernicat identified the prior revocation, *see id.*, and the Board's denial of the grievance acknowledged that Beberman could have rejected the settlement offer as late as December 11, *see* ECF No. 37-32 at 34. Put differently, the Board's ruling is consistent with the timeline that Be-berman says the evidence would have shown—that she rejected the settlement offer shortly before Bernicat communicated with Jackson about the potential problem with consular-systems access.

Thus, even putting aside the confidentiality of the mediation discussions, Beberman failed to show that this evidence would add information relevant to her claim.  As to the report, the Board noted that Beberman had obtained the information in it from another appeal, so it was not new evidence warranting reopened discovery.  *See* ECF No. 37-37 at 11.  Nor did Beberman offer anything but "mere speculation" that the Consular Affairs decisionmakers had relied on the report.  *Id.* at 10.  More fundamentally, the report was not "relevant to [the Board's] finding" that the Department did not retaliate against Beberman.  *Id.* at 11.  Again, Beberman's gripes with these evidentiary rulings do not show that the Board abused its considerable discretion.  And they are a far cry from showing "the most extraordinary circumstances" that would "warrant the Draconian sanction of overturning [the Board's] reasoned . . . decision" rejecting her grievance.  *Port Auth. of N.Y. & N.J.*, 479 F.3d at 37.

## IV.    Conclusion

For all the above reasons, the Court will deny Plaintiff's Motion for Summary Judgment and grant Defendant's Cross-Motion for Summary Judgment.  A separate order will issue.

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: December 11, 2024